UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

         - against -

                                     08 CR 1311 (RPP)

SERGIO RODRIGUEZ,
EUGENIO CRISOSTOMO, and           **ORDER & OPINION**
RUDY MEJIA,


                        Defendants.
-------------------------------------------------------------X


**ROBERT P. PATTERSON, JR., U.S.D.J.**

On December 22, 2008, a grand jury sitting in the Southern District of New York returned an indictment charging Sergio Rodriguez, a/k/a "Tocayo," Rudy Mejia, and Eugenio Crisostomo, a/k/a "Rafi," a/k/a "Cuna," with conspiring to distribute and possess with intent to distribute over five kilograms of cocaine and a detectible amount of marijuana, in violation of Title 21, United States Code, Section 846 (the "Indictment"). Defendant Crisostomo was arrested by Special Agents of the Drug Enforcement Administration ("DEA") in the Southern District of New York on January 21, 2009, and Defendant Mejia was arrested in the Western District of Texas on January 20, 2009, subsequent to which he waived his <u>Miranda</u> rights and made several incriminating statements.

With this motion, Defendant Crisostomo has moved for the following pre-trial orders: (a) suppression of electronic surveillance communications obtained through court-authorized wiretaps of a cellular telephone used by one of his co-defendants (Defendant Rodriguez) and all evidence derived therefrom; (b) suppression of his

1

statements and physical evidence gathered during a September 2007 traffic stop; (c) severance, pursuant to <u>Bruton v. United States</u>, 391 U.S. 123 (1968); (d) requiring the Government to disclose any Rule 404(b) evidence, and (e) requiring the Government to produce all <u>Brady</u> and <u>Giglio</u> material 60 days prior to the commencement of trial. Defendant Mejia has joined in Defendant Crisostomo's motions for: suppression of the Court authorized interceptions, for severance pursuant to <u>Bruton</u>, for disclosure of Rule 404(b) evidence, and for disclosure of <u>Brady</u> and <u>Giglio</u> material.[1]

Oral argument on this motion was held on July 31, 2009, subsequent to which, the Court reserved decision. This opinion now follows. For the following reasons, Defendants' motion to suppress is denied, Defendants' motion for discovery is granted in part to the extent indicated, and Defendants' motion for severance is denied without prejudice to renew at a later date.

## 1. Factual Overview

Beginning in December 2003, DEA agents commenced an investigation into a multi-kilogram cocaine trafficking organization operated by Ruben Gil and Martin Nelson-Garcia. (Govt. Ex. C [Affidavit of Special Agent Louis Maniacci in Support of the Wiretap Application, dated September 13, 2007 ("Maniacci Aff."), ¶¶30, 32]; Crisostomo Ex. B [same].) Over the next three years, wiretaps from this investigation revealed that Garcia and Gil were suppliers of multi-kilogram quantities of cocaine. (<u>Id.</u>) Based on this information, Arizona agents began investigating an arm of that drug

---

[1] Defendant Crisostomo's memorandum of law in support of his motion to suppress, filed on May 30, 2009, is referred to as "Crisostomo Memo." The accompanying exhibits are referred to as "Crisostomo Ex. __," and his June 1, 2009 affidavit in support of his motion to suppress is referred to as "Crisostomo Aff." Defendant Mejia's memorandum of law in support of his motion to suppress, filed on June 1, 2009, is referred to as "Mejia Memo." The Government's memorandum of law in opposition to Defendants' motion, filed on June 16, 2009, is referred to as "Govt. Memo," and the accompanying exhibits are referred to as "Govt. Ex. __." Defendant Rodriguez has not yet been arrested.

trafficking organization which was located in Arizona, and which was being coordinated by Feliciano Ayala-Zamora ("Ayala") and Miguel Hernandez-Martinez.  (Id.)

An investigation by Arizona DEA agents resulted in the seizure of a large amount of cash and cocaine, revealed that Gil and Garcia had lost trust in Ayala to distribute their cocaine, and further revealed that Ayala had begun to use Defendant Rodriguez as a source of supply for cocaine.  (Id. ¶¶33-36.)  Based on this information, from November 6, 2006 to May 2, 2007, an Arizona judge issued three separate 30-day orders authorizing the interception of wire communications over cellular telephones used by Ayala ("Ayala Phones").  (Id. ¶34.)  A separate Arizona judge, from May 31, 2007 to July 19, 2007, signed two separate 30-day orders authorizing the interception of two cellular telephones being used by Hernandez-Martinez ("Hernandez-Martinez Phones").  (Id.)

While monitoring the Ayala and Hernandez-Martinez Phones in Arizona, DEA agents intercepted several telephone calls wherein Defendant Rodriguez discussed his role in various past and future narcotics transactions.  (Id. ¶¶34-43.)  These calls from/to Defendant Rodriguez were made from the assigned call number (656) 143-2857, which belonged to Defendant Rodriguez ("Tocayo Cellphone").   On June 29, 2007, Phoenix DEA arrested Hernandez-Martinez in possession of approximately 12 kilograms of cocaine.  (Id. ¶34.)  After that date, Defendant Rodriguez, using the Tocayo Cellphone, began contacting Ayala by telephone to arrange various narcotics deals.  (Id. ¶¶34-43.)

On September 13, 2007, Louis Maniacci, a Special Agent working for the Phoenix DEA, in conjunction with the Maricopa County (Arizona) Attorney's Office, made an application for a wiretap (Maniacci Aff.) of the Tocayo Cellphone, which had the assigned call number (656) 143-2857.  (Govt. Ex. C; Crisostomo Ex. B.)  In support

3

of this order, the Maricopa County's Attorneys' Office submitted an accompanying application, which provided further details on the target telephone.  (Govt. Ex. D [Ex Parte Application of Andrew Thomas, dated September 13, 2007].)  That same day, the Honorable Roland Steilne of the Superior County of Arizona issued an order authorizing the interception of communications on the Tocayo Cellphone for a period of thirty days ("September 13, 2007 Order"), from September 13, 2007 to October 12, 2007. (Crisostomo Ex. A [September 13, 2007 Order].)  Defendant Rodriguez ("Tocayo"), along with a number of other co-conspirators, was listed as a "target" of the interceptions; neither Defendant Crisostomo nor Defendant Mejia were listed as targets on the wiretap application.  (Id. at 1-2.)

From September 14 to September 17, 2007, just after Arizona agents began intercepting telephone calls on the Tocayo Cellphone, they learned from those interceptions that Defendants Crisostomo, Mejia and Rodriguez were coordinating a drug shipment from El Paso, Texas, via semi-tractor trailer, to the northeastern part of the United States.  (Govt. Ex. E [Application and Affidavit for Search Warrant, Western District of Texas, dated September 18, 2007].)  The semi-tractor trailer was to be driven by "CUNA LNU," who was later identified as Defendant Crisostomo.  (Id.)

On the evening of September 17, 2007, based on information the "Phoenix DEA" had learned from monitoring the Tocayo Cellphone and had communicated to agents located in El Paso, Texas, Texas DEA commenced surveillance of the three defendants. (Id.).  After several hours of surveillance, El Paso agents observed a commercial tractor trailer truck being driven on Highway 1-10 in El Paso by Defendant Crisostomo.  (Id.)

4

The DEA agents pulled over Defendant Crisostomo's tractor trailer truck, asked him for identification, and also sought his consent to search the cabin and trailer of the truck.  Defendant Crisostomo allegedly consented to the search, and the agents, using a K9, searched the cab of the truck.[2]  (Id.)  The K9 showed an interest, but did not positively respond for the presence of narcotics.  (Id.)  The "cursory search" of the tractor "produced negative results for narcotics," and a subsequent search of the attached trailer indicated that the trailer was empty.  Defendant Crisostomo was not handcuffed or restrained during the search.

After this initial search, the agents asked Defendant Crisostomo whether he would allow them to x-ray the cabin and trailer of the truck, and Defendant Crisostomo allegedly gave his oral consent.  (Id.)  The truck was taken to a nearby border post by the DEA agents, where it was x-rayed; no narcotics were recovered.  (Id.)  After this was completed, the agents returned to the area where the initial stop was made, permitted Defendant Crisostomo to retrieve clothing and belongings from the truck, and then dropped him off at a nearby hotel.  (Id.)  The next morning, on September 18, 2007, Special Agent Cesar Hernandez applied for a search warrant to conduct a more thorough search of the truck (Govt. Ex. E), and a search warrant was issued by Magistrate Judge Michael McDonald.  No narcotics were discovered during that subsequent search. During the traffic stop, Defendant Crisostomo made several statements to, or within earshot of, DEA officers, some of which were potentially incriminating.  (Id.)

---

[2] A court document discovered during a cursory search of the tractor trailer revealed that Defendant Crisostomo and a "Jorge Rodriguez" had had $27,000 in cash, several counterfeit purses and wallets, and a 2004 Toyota Camry seized from their possession subsequent to a traffic stop conducted by police in Pennsylvania on December 20, 2006.

On November 2, 2007, United States District Judge Philip Martinez of the Western District of Texas authorized the continued interception of the Tocayo Cellphone after he received an application for renewal (Govt. Ex. G [Renewal Application I]) and a supporting affidavit sworn by Special Agent Matthew Sandberg of the DEA (Govt. Ex. F [Sandberg Aff. I].)  On December 3, 2007, Judge Martinez re-authorized the continued interception of the Tocayo Cellphone, again after receiving an application for renewal (Govt. Ex. I [Renewal Application II]) and a supporting affidavit sworn by Agent Sandberg (Govt. Ex. H [Sandberg Aff. II].)  And on January 2, 2008, Judge Martinez again re-authorized the continued interception of the Tocayo Cellphone after receiving an application for renewal (Govt. Ex. K [Renewal Application III]) and a supporting affidavit sworn by Special Agent Sandberg (Govt. Ex. J [Sandberg Aff. III].)

**2. Defendants' Motion to Suppress the Electronic Surveillance Communications Derived from the September 13, 2007 Arizona Wiretap Application is Denied.**

Defendants Crisostomo and Mejia move to suppress the transcripts of the wiretap interception authorized by Arizona Superior Court Judge Roland Steilne on September 13, 2007, as well as all evidence derived therefrom, claiming that the issuance of the warrant by the Arizona judge was illegal and improper.  (Crisostomo Memo ¶¶ 22-70.) Specifically, Defendants claim that: the Arizona court lacked jurisdiction to order the interception of the wiretap (Crisostomo Memo ¶¶22-36; Mejia Memo at 8-9); that the application for the warrant did not comply with the Arizona wiretap statute (Crisostomo Memo ¶¶36-43; Mejia Memo at 8); that the application for the wiretap warrant failed to set forth facts which properly alleged that normal investigative procedures have failed in the investigation for which authorization for wire interceptions were being required, in violation of 18 U.S.C. Section 2518(1)(c) (Crisostomo Memo ¶¶44-70), and; that the

Government has failed to prove that the application to the Texas court for the wiretap was authorized by the Attorney General or his designee as required by 18 U.S.C. Section 2516(1). For the following reasons, Defendants' motion is denied.

A. Standing to Challenge the Title III Intercepts

As a threshold argument, the Government contends that none of the moving Defendants has standing to seek suppression of the intercepted oral communications. In order to have standing, a defendant must establish that he has a legitimate expectation of privacy that was violated by the Government's electronic surveillance. See United States v. Bianco, 998 F.2d 1112, 1122 (2d Cir. 1993); United States v. Montoya-Eschevarria, 892 F. Supp. 104, 106 (S.D.N.Y. 1995). Under Title III, only an "aggrieved person" may seek to suppress oral communications intercepted by the Government. See 18 U.S.C.A. 2518(10)(a) (West 2000); United States v. Fury, 554 F.2d 522, 525 (2d Cir. 1977). Title III defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed." 18 U.S.C.A. § 2510(11) (West 2000); see also Bianco, 998 F.2d at 1122 (intercepted defendants have standing to challenge wiretaps); United States v. Caruso, 415 F. Supp. 847, 849-50 (S.D.N.Y. 1976) ("only those defendants whose conversations were intercepted or against whom the interception was directed, or on whose premises the conversations took place, may assert the unlawfulness of the interception").

Accordingly, there are two ways for a defendant to establish standing. First, a defendant can submit "sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge" establishing that it was the defendant's voice that was captured on the wiretap. Montoya-Eschevarria, 892 F. Supp. at 106;

United States v. Bellomo, 954 F. Supp. 630, 639 (S.D.N.Y. 1997).  Neither Defendant here has submitted such evidence.  Second, defendants who are named targets or interceptees of a wiretap automatically have standing under Title III.  See, e.g., United States v. Columbo, 2006 U.S. Dist. LEXIS 49255, *33-34 (S.D.N.Y. 2006); United States v. Labate, 2001 U.S. Dist. LEXIS 6509 (S.D.N.Y. 2001).  The burden of establishing standing is on the party moving to suppress evidence.  United States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991).

Counsel for Defendant Mejia states that he is an "aggrieved person" within the meaning of Title III because the "government alleges that he was a party to the communications intercepted by the government."  (Mejia Memo at 6.)  However, "the law is clear that the burden on the defendant to establish standing is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge.  The defendant's unsworn assertion of the Government's representations does not meet this burden."  Montoya-Eschevarria, 892 F. Supp. at 106 (rejecting same argument put forth here, i.e., that the government's representations that it was the defendant on the recordings establishes standing).  Accordingly, Defendant Mejia's reliance on the Government's averments to establish standing is rejected.

Defendant Crisostomo's standing argument, that he was a named interceptee on the September 18, 2007 Texas search warrant application and therefore has standing to challenge the earlier September 13, 2007 Arizona wiretap application, fares little better. It is undisputed that Defendant Crisostomo was not a named interceptee or target in Special Agent Maniacci's initial September 13, 2007 application to wiretap the Tocayo cellphone.  (Govt. Ex. C.)  Only Defendant Rodriguez, who is not a moving defendant

here, was a named target in that application.  Defendant Crisostomo relies instead upon the September 18, 2007 search warrant affidavit sworn to by Special Agent Cesar Hernandez, which was filed after the stop of his tractor trailer to support Agent Hernandez's application for a warrant to conduct a full search of Defendant Crisostomo's tractor-trailer.  (Govt. Ex. E.)

In that search warrant application, which was written five days <u>after</u> the initial wiretap application had been filed and approved, Agent Hernandez averred that Defendant Crisostomo had been captured on the wiretap discussing an upcoming narcotics delivery.  This, Defendant Crisostomo asserts, is sufficient to establish that he was a "named interceptee," which in turn, gives him standing to challenge the intercepted communications.  The term "named interceptee" refers to targets listed on the initial application for a wiretap, while here, Defendant Crisostomo relies on a search warrant affidavit issued five days <u>after</u> the initial application for a wiretap had been approved and the wiretap had already commenced.  See, e.g., <u>Bellomo</u>, 954 F. Supp. at 639-40 (in ruling that the defendant lacked standing to challenge the wiretap, explained that the defendant "was neither a target nor a named interceptee in the <u>initial</u> application") (emphasis added).

At oral argument, Defendant Crisostomo relied upon the recent case of <u>Columbo</u>, 2006 U.S. Dist. LEXIS 49255 for his position that a defendant has standing to challenge the wiretap if he is a "named interceptee in a sworn affidavit of the government's that describes any interceptions that have taken place either in the Title III affidavit or in any search warrant affidavit" of which probable cause has been "acquired derivatively from a wiretap."  (Tr. 3.)  From this, Defendant Crisostomo argues that he has standing to

challenge the initial September 13, 2007 wiretap because the September 18, 2007 search warrant application relied, in part, on communications authorized by the September 13, 2007 order.  However, Defendant Crisostomo's reliance on Columbo is in error because in that case "all four [moving] defendants were named targets of the [wiretap] surveillance," while here, Defendant Crisostomo was not a named target of the wiretap surveillance.  Rather, Defendant Crisostomo was inadvertently intercepted on the Arizona wiretap ordered by Judge Steilne, which was targeting other persons.  Accordingly, by the plain language of Title III, which states, in pertinent part, that only "a person against whom the interception was directed" has standing to challenge the wiretap evidence, Defendant Crisostomo does not have such standing.

Hence, as neither Defendant was a named target of the initial September 13, 2007 wiretap application and neither Defendant has conceded that it is his voice on the recordings, neither Defendant has standing to challenge the admissibility of the challenged wiretaps.  Furthermore, as shown below, even assuming that both moving Defendants have standing, their arguments for suppression of the Arizona wiretap evidence are rejected.

B. The Maricopa County Superior Court of Arizona Properly Authorized the Interception of Calls Made and Received by the Tocayo Cellphone.

The target telephone (Tocayo Cellphone) was subscribed to by Defendant Rodriguez at an address located in El Paso, Texas, it had an area code associated with Ciudad Juarez, Mexico, and other than three calls placed to an Arizona phone, there is little evidence that the Tocayo Cellphone was used within the State of Arizona.  Based on these facts, Defendants argue that the Arizona State Court exceeded its jurisdiction by authorizing interception of the Tocayo Cellphone.

Under Title 18, United States Code, Section 2518(3), in conjunction with Title 18, United States Code, Section 2516(2), a judge may issue an order "approving interception of wire, oral or electronic communications within the territorial jurisdiction of the court in which the judge is sitting."  "Interception" is defined as "aural or other acquisition of the contents or any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  18 U.S.C. § 2510(4).  Defendants do not challenge the assertion that the calls were routed to an Arizona location where they were intercepted and recorded.[3]

Under existing case law, this is sufficient to demonstrate that the calls were "intercepted" within Arizona, thereby giving the Arizona court jurisdiction to issue the wiretap.  See United States v. Rodriguez, 968 F.2d 130, 136 (2d Cir. 1992); United States v. Bernardino, 2007 U.S. Dist. LEXIS 92920 (S.D.N.Y. 2007) (location where the calls are listened to and recorded has jurisdiction to authorize their interception); United States v. Gotti, 42 F. Supp. 2d 252, 286 (S.D.N.Y. 1999) (same).

Relatedly, Defendants argue that the warrant application failed to comply with Arizona statute A.R.S. 13-3010(B)(2)(d), which states that the application must include a "particular description of the nature, identification and location of the communication facility from which or the place where the communication is to be intercepted." Accordingly, to comply with the statute, the warrant application must provide a particular description of the nature, identification and location of the communication facility or a description of the place where the interception is to take place.

_____

[3] The September 18, 2007 Texas search warrant application drafted by Special Agent Hernandez details that the "Phoenix DEA" intercepted the calls from the Tocayo Cellphone.

The September 13, 2007 application expressly complied with the requirements of A.R.S. 13-3010(B)(2).  First, in both the Maniacci Affidavit and in the attached Affidavit drawn up by a Deputy County Attorney of Maricopa County, the affiants provided a clear description of the nature, identification and location of the communication facility, by providing the phone's telephone number, service provider, international mobile station identity number, and anticipated users.  (Maniacci Aff. ¶12; Govt. Ex. D [Section VI].) Second, the applications also expressly stated in Section V that the communications to be intercepted were telephone communications "located and operated within Maricopa County, Arizona." (Govt. Ex. D [Section V].)  Accordingly, both prongs of the Arizona statute (the description of the communication facility and the place of interception) are satisfied here.  See United States v. Goodwin, 141 F.3d 394, 403 (2d Cir. 1997) (in approving wiretap falling under the similar language of 18 U.S.C. 2518(1)(b)(ii), held that statute was satisfied by provision of telephone numbers and electronic serial numbers).

C.  The Government Complied with 18 U.S.C. Section 2518(c)

Defendants next argue that the wiretap application and the supporting affidavits failed to set forth facts which allege that normal investigative procedures have failed in the investigation for which authorization for the wire interception was being requested, and therefore, failed to meet the standards defined by 18 U.S.C. Section 2518(1)(c).

An application for a wiretap authorization must provide a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous …" 18 U.S.C. Section 2581(1)(c).  To issue authorization for a wiretap, a judge must find that

"normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous …" 18 U.S.C. Section 2518(3)(c).  "This is far from an insurmountable hurdle"; rather, "the government must demonstrate only that normal investigative techniques would prove difficult."  Bellomo, 954 F. Supp. at 636; see also United States v. Young, 1234, 1237 (2d Cir. 1987) ("there is no requirement that any particular investigative procedures be exhausted before a wiretap may be authorized").  "A reasoned explanation grounded in the facts of the case, and which 'squares with common sense, is all that is required.'"  United States v. Ianniello, 621 F. Supp. 1455, 1465 (S.D.N.Y), aff'd, 808 F.2d 184 (2d Cir. 1985) (quoting United States v. Shipp, 578 F. Supp. 980, 989 (S.D.N.Y. 1984)).[4]  Indeed, the statute "only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."  United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999).

Here, Defendants argue that methods other than this challenged wiretap were successful in obtaining information on the multi-state cocaine distribution ring run by Nelson-Garcia and Gil, and that this defeats any argument that "alternative investigative techniques were either inadequate or too dangerous to be employed."  However, simply because the other alternative techniques were successful in obtaining some gain against the aforementioned drug conspiracy does not mean that the challenged wiretap was not needed to investigate fully this drug conspiracy.  See United States v. Lilla, 699 F. 2d 99,

---

[4] As the Second Circuit explained in United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990), the "purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."

102 (2d Cir. 1983) (it is not a requirement of Section 2518 that ordinary investigative techniques be exhausted before wiretaps may be authorized).

In that regard, in Agent Maniacci's affidavit the Government explained that interceptions over the Ayala and Hernandez-Martinez phones were unlikely to lead to the discovery of the source of the cocaine because the other members of this drug trafficking organization limit their exposure to law enforcement by using Ayala and Hernandez-Martinez as points of contact.  (Maniacci Aff. ¶51.)  Further, the Government noted how interceptions of the Tocayo Phone were needed to "identify and intercept unidentified co-conspirators involved with the drug trafficking organization," one of whom was the then newly unidentified source of the cocaine supply, Defendant Rodriguez.  (Id.) Indeed, it is only because of the wiretap of the Tocayo cellphone, and surveillance based on what was learned from the wiretap, that Defendants Crisostomo and Mejia's role as transporters and co-conspirators was discovered.

In addition to this crucial information that was gleaned from the Tocayo Cellphone wiretaps, the Government informed the judge of the difficulties in developing confidential sources for information (Maniacci Aff. ¶52), and it provided similarly case-specific explanations with respect to how this wiretap would assist the Government in establishing locations in advance of planned meetings, as well as why the use of undercover agents and other techniques were unlikely to be successful in achieving the aims of the investigation.  (Maniacci Aff. ¶¶56-63.)  Simply put, the Maniacci Affidavit provided substantial detail regarding why alternative investigative techniques were not alone sufficient to conduct this investigation.  See, e.g., United States v. Villegas, 1993 U.S. Dist. LEXIS 18042 (S.D.N.Y. 1993) (rejecting allegations that the government had

not gone to sufficient lengths to explore normal investigative techniques, and finding that the wiretaps were necessary  to "gather information about the full scope of the conspiracy which could not be satisfactorily obtained through the use of ordinary investigative methods); United State vs. Launi, 1989 U.S. Dist. LEXIS 8120 (S.D.N.Y. 1989) (rejecting allegation that the government had not adequately explored normal investigative techniques, where government had compiled a "mass of evidence" about the defendants from an informant and undercover agent.)[5]

Accordingly, Defendants' motion to suppress on this ground is denied.

D. The Wiretaps Authorized by the United States District Court for the Western District of Texas Were Approved by the Attorney General or His Designee.

Title 18 U.S.C. § 2516(1) mandates that the government official seeking court authorization for a wiretap must acquire the approval of the Attorney General or his designee prior to submitting such a request to the Court.  Defendants here argue that the Government failed to comply with the terms of this statute.  However, accompanying each of the Western District of Texas wiretap applications (dated November 2, 2007, December 3, 2007, and January 2, 2008) was an order of the Attorney General which was in effect at the time of the wiretap authorizations here and which designated any Deputy Assistant Attorney in the Criminal Division to authorize wiretap applications.  (Govt.

---

[5] Defendants also argue that much of Agent Maniacci's affidavit consisted of "mere boilerplate."  (Nelson Aff. ¶62-66.)  However, not only does the Maniacci affidavit consist of detailed factual allegations pertaining to the current investigation (i.e. not boilerplate), Bellomo, 954 F. Supp. at 639 (rejecting claim that alternative means section of affidavit was "mere boilerplate that was not sufficient to satisfy the requirement of the statute"), but courts have long rejected such similar complaints by a defendant.  See United States v. Herrera, 2002 U.S. Dist. LEXIS 17697 (S.D.N.Y. 2002) (in upholding mere "boilerplate" language, stated that it "should come as no surprise that the facts supporting the conclusion that the alternative methods would be unavailing often are similar from one narcotics operation to another"); United States v. Shipp, 578 F. Supp. 980, 988 (S.D.N.Y. 1984) (upholding affidavit attacked as "boilerplate" recitation of the usual techniques of surveillance, telephone toll records, pen registers, informants, or search warrants").

Exs. G, I, and K.)  These applications were then signed by Deputy Assistant Attorney

General Barry Sable.  (Id.)  Accordingly, as the statute specifically permits the Attorney

General to designate officials of that rank to authorize wiretap applications, the

Government complied with the terms of that statute.  See, e.g., United States v. Clarke,

2008 U.S. Dist. LEXIS 41697, *16 (E.D.N.Y. 2008) (wiretaps authorized by Deputy

Assistant Attorney General sufficiently complied with Title 18 U.S.C. 2516(1)).

**3. Defendant Crisostomo's Motion to Suppress the Statements Made and Physical Evidence Seized During the September 17, 2007 Traffic Stop is Denied Without a Hearing.**

The allegations contained within the Western District of Texas September 18,

2007 search warrant application submitted by Special Agent Hernandez (Govt. Ex. E),

stated that from September 13 to 17, 2007, DEA agents who had been monitoring the

Tocayo Cellphone determined that a planned drug shipment would be transported via a

semi-tractor from El Paso, Texas to the northeastern United States.  Based on the

monitored conversations, on September 17, 2007, a tractor trailer being driven by

Defendant Crisostomo was stopped by DEA agents in El Paso, Texas, after agents

observed the tractor trailer repeatedly cross highway lane lines.  Once the truck was

stopped, the agents asked Defendant Crisostomo to step out of the cabin, whereupon he

consented to the search of the cabin and trailer of the truck, and he further consented to

the x-ray of the trailer.

During the traffic stop, Defendant Crisostomo made a number of potentially

incriminating statements.  Agents also recovered from the passenger compartment of the

truck a "court document" concerning the seizure of a "sum of United States Currency,

several counterfeit purses and wallets … subsequent to a traffic stop conducted on

16

December 20, 2006 in Pennsylvania." (Govt. Ex. E.) Defendant Crisostomo moves to suppress both the physical evidence and statements made during the traffic stop.

    A. <u>The Stop and Search of Defendant Crisostomo's Vehicle was Proper.</u>

    In arguing that physical evidence seized during the traffic stop need be suppressed, Defendant Crisostomo first argues that the police lacked "either an articulable suspicion or probable cause to believe that [he] had committed a traffic offense." Defendant Crisostomo further argues that any alleged consent he gave to the agents to search his vehicle subsequent to the traffic stop was given involuntarily. However, even crediting Defendant's argument that the officers lacked a sufficient basis for suspecting him of committing a traffic offense and also that his consent was involuntarily obtained, the stop and search of Defendant's vehicle was proper under the automobile exception to the warrant requirement.

    This exception permits law enforcement agents to stop and "conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." <u>United States v. Howard</u>, 489 F.3d 484, 492 (2d Cir. 2007); <u>United States v. Gaskin</u>, 364 F.3d 438, 456 (2d Cir. 2004); <u>see also</u> <u>California v. Acevedo</u>, 500 U.S. 565, 580 (1991) ("the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained").

    Probable cause exists if, based on the totality of the circumstances, the officers performing the search have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." <u>Howard</u>, 489 F.3d at 491. Probable cause does not

demand certainty, but instead requires "only a fair probability that contraband or evidence of a crime will be found." Gaskin, 364 F.3d at 457.

Here, and as DEA agents set forth in their September 18, 2007 Texas search warrant application to conduct a complete physical search of the semi tractor trailer, during the period of September 13 to 17, 2007, Phoenix DEA agents had intercepted numerous calls from the Tocayo Cellphone pertaining to a pending shipment of drugs via semi-tractor trailer from El Paso to the northeast United States. (Govt. Ex. E [September 18, 2007 Texas search warrant application to search the semi tractor trailer].) Previous wire intercepts from that same drug trafficking organization had resulted in the seizure of 43 kilograms of cocaine and over $500,000. (Id.) The calls further revealed that the user of Nextel phone "121-728-15892" was the scheduled delivery driver for the shipment. (Id.) Phoenix DEA agents were able to trace that phone and were able to provide the Texas DEA with the GPS coordinates of the phone. (Id.)

On Monday, September 17, 2008, El Paso DEA agents received information from Agent Maniacci of the Phoenix DEA of calls being made on the Tocayo Phone from Tocayo to Cuna (later identified as Defendant Crisostomo), which stated that Defendant Crisostomo was about to drive away in the tractor trailer carrying the drug shipment. (Govt. Ex. E.) Again using GPS technology, the Phoenix DEA agents were able to pinpoint the location of the phone in the tractor trailer, and were thereby able to locate and place the suspect tractor trailer under surveillance. (Id.) At 8:00 p.m. that evening, DEA agents observed the targeted tractor trailer drive east on Peggy Hopkins Street and then west on I-10. (Id.) While the Texas DEA agents followed the truck, they received frequent updates from Agent Maniacci, who confirmed that the location of the targeted

Nextel phone corresponded with what the DEA surveillance was observing (i.e. the truck).   (Id.)   Shortly thereafter, the DEA agents stopped the truck being driven by Defendant Crisostomo.   (Id.)   The above-mentioned facts set forh in the DEA's September 18, 2008 application for a search warrant are not contested by Defendants.

Accordingly, given the totality of the circumstances here, the Government plainly had probable cause to believe that Defendant Crisostomo was transporting narcotics in his truck, and therefore, under the automobile exception, the agents properly stopped and searched the vehicle.

B. The Statements Defendant Crisostomo Made During the Stop and Search of his Truck were not Obtained in Violation of Miranda.

Next, Defendant Crisostomo argues that any statements he made to agents during the search of his truck should be suppressed because they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).   See United States v. Ali, 68 F.3d 1468 (2d Cir. 1995) (whether a car stop and search is permissible is "irrelevant to the Miranda analysis," which must be done separately.)

It is axiomatic that police may not interrogate a suspect who has been taken into custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."   Miranda, 384 U.S. at 479.   The government acknowledges that Defendant did not receive Miranda warnings prior to making the challenged statements to the DEA agents, but it argues that no such warnings were required because Defendant was not "in custody" at the relevant time.   See Parsad v. Greiner, 337 F.3d 175, 180 (2d Cir. 2003) (Miranda warnings apply only to custodial

interrogation); Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998) (same). Accordingly, the suppressibility of Defendant's statements turns on whether he was in custody during the time when his truck was being searched.

The test for determining whether a suspect is "in custody" is an objective one; the subjective views of either the officer or the suspect are irrelevant. United States v. Kirsteins, 906 F.2d 919, 923 (2d Cir. 1990). To ascertain whether a Defendant is "in custody," a court must ask "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). As the Second Circuit has explained, this test is two-fold: (i) it must be determined whether an objectively reasonable person in the defendant's shoes would have thought he or she was free to leave, and if not, (ii) whether an objectively reasonable defendant "would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." United States v. Newton, 369 F.3d 659, 671 (2d Cir. 2004) (quoting United States v. Ali, 68 F.3d 1468, 1472 (2d Cir. 1995)).

Here, after being stopped, six or more law enforcement officers were present, and his truck had been temporarily detained. Accordingly, a reasonable truck driver in Defendant's shoes would not have felt that he was free to leave. However, no reasonable defendant "would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." In that regard, by his own affidavit, Defendant concedes that he was never handcuffed or otherwise restrained, he was never told that he could not leave the scene, and no officer physically restricted his freedom of movement.

Indeed, Defendant was permitted to use his own mobile telephone and answer incoming calls while the agents searched his vehicle.  (Crisostomo Aff. ¶¶8-14.)

Accordingly, Defendant was not subjected to the restraints comparable to those associated with a formal arrest, and therefore, his motion to suppress the statements he made during the stop of his vehicle is denied.[6]

## 4. Defendants' Motion to Sever

Defendants move for severance under Rule 14 based on the post-arrest statement of his Defendant Rudy Mejia, which allegedly inculpated Defendant Crisostomo in narcotics trafficking.  (Crisostomo Memo ¶¶103-04.)  This motion to sever is premature because "the Court does not know [if the other two defendants] will plead before trial or how other pre-trial motions might limit the scope of the trial."  United States v. Heatley, 1997 U.S. Dist. LEXIS 209 (S.D.N.Y. 1997).  Further, the Government has submitted that the statements at issue can be redacted to ensure that they are inculpatory only as to the party making the statement, thereby eliminating the need for severance.  Thus, Defendants' motion to sever is denied without prejudice to renew at a later date prior to trial.

## 5. Defendants' Request for Discovery

---

[6] Nor is Defendant Crisostomo entitled to a hearing to determine whether his statements need be suppressed, because in his affidavit, he presents no evidence indicating that he was restrained to a degree associated with a formal arrest.  Rather, he only indicates that he was "effectively held" by the agents since his "sole means of transportation, [his] vehicle, was detained."  This conclusory averment is insufficient to create a disputed issue of fact warranting a hearing because even if credited, Defendant would not be entitled to the relief requested (suppression of his statements).  See United States v. Kornblau, 586 F. Supp. 614, 621 (S.D.N.Y. 1984) (to be entitled to an evidentiary hearing, a defendant must first state "sufficient facts which, if proven, would [require] the granting of the relief requested"); see also United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992) (an "evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact … are in question"); United States v. Viscioso, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) (in personal affidavit, the defendant must show that "disputed issues of material fact exist before an evidentiary hearing is required.")

First, Defendants request disclosure of evidence the government will seek to admit under Rule 404(b).  (Crisostomo Memo ¶105.)   Rule 404(b) only requires "reasonable notice in advance of trial" for the admission of prior convictions and bad acts.  The Government has noted its obligations under Rule 404(b), and has indicated that it will provide notice of the 404(b) evidence it intends to introduce two weeks before beginning of trial.  Although there is therefore no need to issue the order Defendants seek, see United States v. Fennell, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007), the Court orders that applications under Rule 404(b) be filed three weeks before trial.

Next, Defendants request the disclosure of all Brady v. Maryland, 373 U.S. 83 (1963) material, including that falling under Giglio v. United States, 405 U.S. 150 (1972), at least 60 days before trial.  The Government states that it is aware of no Brady material and will turn it over promptly if any is discovered.  The Government also represents to the Court that it will turn over Giglio material in time for its effective use by Defendant.  This Court orders that Giglio material within the Government's possession be turned over twenty-one days before the commencement of trial, and that if additional material arises during pre-trial preparation subsequent to the twenty-one day deadline, the Government will turn over such material immediately.  Brady material is to be turned to Defendants as it is discovered by the Government.

**Conclusion**

For the foregoing reasons, Defendants' motions to suppress are denied in their entirety.  Defendants' motions for discovery are ordered to the extent indicated.  Defendant Crisostomo's motion for severance is denied without prejudice to renew.  As the parties are aware, the trial date had been previously set for November 23, 2009.

IT IS SO ORDERED.
Dated: New York, New York
     August *19*, 2009

Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Opinion and Order faxed to:

Attorney for the Government
Natalie LaMarque, Esq.
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Fax: 212-637-2527

Attorney for Defendant Rudy Mejia
Karl H. Buch, Esq.
Chadbourne and Parke, LLP
30 Rockefeller Plaza
New York, New York 10112
Fax: 646-710-1074

Attorney for Defendant Eugenio Crisostomo
Alan M. Nelson, Esq.
3000 Marcus Avenue
Suite 1E5
Lake Success, NY 11042
Fax: 516-328-6354

23